**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**UNITED STATES OF AMERICA** **PLAINTIFF**

**V.** **CIVIL ACTION NO. 3:67-CV-01396–HTW-LGI**

**NESHOBA COUNTY SCHOOL DISTRICT** **DEFENDANTS**

---

# ORDER

---

Before the Court is the Joint Motion for Declaration of Unitary Status, (hereinafter "Joint Motion"), of the Neshoba County School District (hereinafter "NCSD") and the United States of America (hereinafter "United States"). **[Docket no. 4]**. The Court has reviewed the Joint Motion, Defendant's Memorandum of Law in Support of the Joint Motion, and supporting exhibits. While the Court is inclined to grant the Joint Motion, the Court recognizes the lasting mark this decision will have on the populus within Neshoba County. **Accordingly, this Court will host a community hearing to ensure the voices of all people in Neshoba County are fully heard before wholly deciding the merits of this case.**

## I. BACKGROUND

On January 11, 1967, the United States filed this lawsuit against NCSD seeking disestablishment of NCSD's *de jure* segregated school system. At the time of filing this lawsuit, NCSD operated three schools. Neshoba Central Elementary School attended solely by White students in grades one through six; Neshoba Central High School, also attended by White students in grades seven through twelve; and George Washington Carver Attendance Center, attended by Black students in grades one through twelve.

On November 26, 1969, following further litigation, the United States Court of Appeals for the Fifth Circuit issued an Order Approving Amended Desegregation Plan for NCSD (hereinafter "Order"). The Order adopted a desegregation plan agreed upon by the United States and NCSD. The Order made the plan "a part of [the] order." Order at 1.

Pursuant to the Order, NCSD would operate three schools: Neshoba Central Elementary School, to serve children grades one through six in Neshoba County; Neshoba Central Junior High, to serve children grades seven and eight; and Neshoba Central High School, to serve children grades nine through twelve. *Id.* at 4–5. The Order further required NCSD to; desegregate faculty; transport students on a non-segregated, and otherwise nondiscriminatory basis; select locations and construct new buildings in a manner to prevent the re-occurrence of dual school structures; allow for 'majority-to-minority' transfers, so students may transfer from a school in which their race is a majority to a school in which their race is a minority; and require that transfers outside of NCSD occur on a non-discriminatory basis, "except that [NCSD] shall not consent to transfers where the cumulative effect will reduce desegregation . . . or reinforce the dual school system." *Id.* at 11–12.

For over 56 years, this case has continued without Court intervention. Compliance monitoring by the Department of Justice continued, including periodic requests for responses targeted at gathering data and other information related to NCSD's desegregation obligations. NCSD responded to each of the requests for information and the Department of Justice carefully, fully reviewed and analyzed the responses. NCSD responded to the United States' most recent 2020–2022 request and the United States, faithful to its tradition, has carefully and fully reviewed and analyzed the responses.

## II. JURISDICTION

This court has continuing federal question jurisdiction over this case pursuant to Title 28 U.S.C. § 1331,[1] because the case was originally brought under Section 407[2] of the Civil Rights Act of 1964 (now codified and amended in Title 42 U.S.C. § 2000c–6).[3]

"Whatever plan is adopted [in achieving desegregation] will require evaluation in practice, and the court should retain jurisdiction until it is clear that state-imposed segregation has been completely removed." *Green v. County Sch. Bd. of New Kent Cnty., Va.*, 391 U.S. 430, 439 (1968). Accordingly, this Court has jurisdiction to consider the Joint Motion.

## III. STANDARD OF REVIEW

In order to obtain a declaration of unitary status, NCSD must show that its schools have: (1) fully and satisfactorily complied with the Court's decrees for a reasonable period of time;

---

[1] Title 28 U.S.C. § 1331 states: "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

[2] "(a) Whenever the Attorney General receives a complaint in writing–

> (1) signed by a parent or group of parents to the effect that his or their minor children, as members of a class of persons similarly situated, are being deprived by a school board of the equal protection of the laws, or
>
> (2) signed by an individual, or his parent, to the effect that he has been denied admission to or not permitted to continue in attendance at a public college by reason of race, color, religion, or national origin,
>
> and the Attorney General believes the complaint is meritorious and certifies that the signer or signers of such complaint are unable, in his judgment, to initiate and maintain appropriate legal proceedings for relief and that the institution of an action will materially further the orderly achievement of desegregation in public education, the Attorney General is authorized, after giving notice of such complaint to the appropriate school board or college authority and after certifying that he is satisfied that such board or authority has had a reasonable time to adjust the conditions alleged in such complaint, to institute for or in the name of the United States a civil action in any appropriate district court of the United States against such parties and for such relief as may be appropriate, and such court shall have and shall exercise jurisdiction of proceedings instituted pursuant to this section, . . ."

[3] In the previous footnote, this court cites the original Section 407(a) language from the Civil Rights Act of 1964 under which the United States brought this action. In 1972, subsection (a)(2) was amended to include "sex".

(2) eliminated the vestiges of prior *de jure* discrimination to the extent practicable; and (3) demonstrated a good-faith commitment to the whole of the Court's decrees and to those provisions of the law and the Constitution that were the predicates for judicial intervention in the first instance. *See Missouri v. Jenkins*, 515 U.S. 70, 87–89 (1995); *Freeman v. Pitts*, 503 U.S. 467, 491–98 (1992); *Bd. of Educ. of Oklahoma City Pub. Sch. v. Dowell*, 498 U.S. 237, 248–50 (1991).

The United States Supreme Court has added a test that the courts must employ to determine whether the vestiges of prior *de jure* discrimination have been eliminated. This test enunciated in *Green* sets out the following factors commonly known as the "Green factors," which must be addressed as part of this determination: (1) student assignment; (2) faculty; (3) staff; (4) transportation; (5) extracurricular activities; and (6) facilities. 391 U.S. at 435; *see Manning ex rel. Manning v. Sch. Bd. of Hillsborough Cnty.*, 244 F.3d 927, 942 (11th Cir. 2001) (stating that "for a district court to determine whether the vestiges of discrimination have been eliminated to the extent practicable, it must examine . . . the so-called Green factors").

## IV. ANALYSIS

The Joint Motion *sub judice* represents the parties' efforts to cure NCSD's racial segregation, hopefully of yesteryear. The Motion, being Joint, carries weight. In *Jones v. Caddo Parrish*, the United States Court of Appeals for the Fifth Circuit held that "school desegregation is one of the areas in which voluntary resolution is preferable to full litigation because the spirit of cooperation inherent in good faith settlement is essential to the true long-range success of any desegregation remedy." 704 F.2d 206, 221 (5th Cir. 1983) (citing *Armstrong v. Board of School Directors*, 616 F.2d 305, 318 (7th Cir. 1980). Insofar as NCSD contends that it has reported and tracked its

compliance with the Order, this Court now turns to a review of the *Green* factors to determine whether NCSD may be considered unitary once and for all.

**A. Student Assignment**

The parties attest that NCSD "has complied with this Court's order to implement a single-grade configuration, where all students in a grade attend the same school." [Docket no. 5 at 4]. Further, the parties allege that "[b]y implementing a single-grade configuration, [NCSD] has ensured that the racial make-up of each school is representative of the District-wide student population to the extent practicable[.]" [*Id.*]

"Courts have commonly set either a +/- 15% or +/- 20% deviation from the overall student racial percentages to determine if a school is racially identifiable." *United States v. Mississippi (Choctaw Cnty. Sch. Dist.)*, 941 F. Supp. 2d 708, 717 (N.D. Miss. 2013) (citing *United States v. Tex. Educ. Agency*, 679 F.2d 1104, 1114 (5th Cir. 1982); *United States v. Georgia*, 171 F.3d 1333, 1338 (11th Cir. 1999)).

The parties submit the Order as an Exhibit to the Joint Motion. Part of the Order includes the November 13, 1969, Composite Building Information Form for NCSD, which shows the following: 0 White students and 847 Black[4] students attended George Washington Carver Attendance Center; 0 Black students, 1047 White students, and 4 "[o]ther"[5] students attended Neshoba Central Elementary School; 388 White students and 0 Black students attended Neshoba Central Junior High School; and 589 White students and 3 Black students attended Neshoba Central High School. Order at 7. The "[p]roject[ion] for 2nd semester 1969-70" Composite

---

[4] On this 1969 form, the Court updates the "N" column as Black to reflect modern demographic terminology.

[5] Based on the record, this court is unable to assume with precision the demographic grouping of "Other" as specified in the Composite Building Information Form.

Building information is as follows: Neshoba Central Elementary School, 1051 White students[6] and 413 Black students; Neshoba Central Junior High School, 388 White students and 148 Black students; and Neshoba Central High School, 592 White students and 286 Black students. [*Id.* at 8.]

While the 1969-70 projected statistics did not materialize as anticipated, a review of the parties' statistical reports reveal that there is only one school option for all students in NCSD. Whereas the 1969 Neshoba Central Elementary School had 0.38%[7] Black students in its population; 2026 Neshoba Central Elementary School now has 13% Black students and 33% non-Black and non-White students. [Docket no. 5 at 5]. Whereas the 1969 Neshoba Central Junior High School[8] had 0% Black students in its population; in 2026 Neshoba Central Middle School now has 18% Black students and 21% non-Black and non-White students. [*Id.*] And, whereas the 1969 Neshoba Central High School had 0.51% Black students in its population, in 2026 Neshoba Central High School has 16% Black students and 29% non-Black and non-White students. [*Id.*] The above demographics show dramatic increases in Black and minority populations in NCSD.

Although the Projected 2nd semester 1969-70 data did not fully materialize,[9] the Court notes that attaining desegregation does not require absolute perfection in numbers alone. "Regarding the requirement that a school district eliminate the vestiges of prior *de jure* segregation to the extent practicable, "every reasonable effort [must] be made to eradicate segregation and its insidious residue, although complete racial balance is not required." *Anderson v. Sch. Bd. of Madison Cnty.*,

---

[6] "Total of White[ students] includes [Native Americans]"

[7] The Court calculates this percentage by taking the number of "N" students in the 1969 Composite Building Information and dividing that number by the "T" number of students. For example, here (4 "N" students/1051 "T" students)*100% = 0.38%.

[8] Neshoba Central Middle School was previously named Neshoba Central Junior High School

[9] The Projected 2nd semester 1969-70 demographic information is as follows: Neshoba Central Elementary, 28.2% Black students; Neshoba Central Junior High, 27.6% Black students; and Neshoba Central High School, 32.6% Black students.

517 F.3d 292, 298 (5th Cir. 2008) (quoting *Ross v. Houston Indep. Sch. Dist.*, 699 F.2d 218, 227–28 (5th Cir. 1983) (internal quotations omitted).

> "The constitution does not require school districts to achieve maximum desegregation; that the plan does not result in the most desegregation possible does not mean that the plan is flawed constitutionally. The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole. The school board's constitutional duty is to cure the continuing effects of the dual system, not to achieve an ideal racial balance."

*Monteilh v. St. Landry Parish Sch. Bd.*, 848 F.2d 625, 632 (5th Cir. 1988) (internal quotations and citations omitted).

Here, NCSD did not reach its optimal goal scheduled in the Projected 2nd semester 1969-70 Composite Building Information Form; however, as the parties note, "the racial makeup of all schools in [NCSD] roughly mirror the total District population." [Docket no. 5 at 5].

"We fully recognize that "school desegregation is one of the areas in which voluntary resolution is preferable to full litigation because the spirit of cooperation inherent in good faith settlement is essential to the true long-range success of any desegregation remedy." *Jones*, 704 F.2d at 221. Where there is an absence of a complaint otherwise, a joint and voluntary resolution is preferable to continued litigation. *Id.* Accordingly, this Court finds that NCSD is likely unitary in regard to student assignment. A final decision on the unitary status in regard to student assignment will be made after the community hearing.

**B. Faculty Assignment**

"Teacher assignment to particular school[s] should not be identifiable as tailored for heavy concentration of either [Black] or [W]hite pupils in the school." *United States v. Bd. of Educ. of Baldwin City*, 417 F.2d 848, 850–51 (5th Cir. 1969) (quoting *United States v. Jefferson Cnty. Bd. of Educ.*, 380 F.2d 385, 394 (5th Cir. 1967)).

In the Original 1967 Complaint, the United States of America addressed the Faculty and Staff assignment as follows:

> During the school year 1965-1966 and at all times prior thereto, the traditionally all-[Black] school operated by the defendants was staffed exclusively by [Black] teachers and administrators, and the formerly all-[W]hite school was staffed exclusively by [W]hite teachers and administrators. The defendants have failed and refused to take adequate steps toward faculty and staff desegregation for the 1966-1967 school year or to remove the effect of the past discriminatory assignments based on race and color. Students at the traditionally all-[Black] school have been and are being afforded inferior educational opportunities and facilities.
>
> Original Complaint at 3–4.

The desegregation Order requires that NCSD assign faculty and staff to schools in a manner such that "in no case will the racial composition of a staff indicate that a school is intended for [Black] students or [W]hite students." Order at 8. The Order further requires that NCSD hire, assign, pay, dismiss, and otherwise treat staff in a nondiscriminatory manner "except to the extent necessary to correct discrimination." *Id.*

The 1969 Composite Building Information Form for NCSD indicates there was 1 White staff member and/or teacher and 37 Black[10] staff and teachers at George Washington Carver Attendance Center. No Black staff members worked, or teachers taught, at Neshoba Central Elementary School, Neshoba Central Junior High, or Neshoba Central High School. Order at 7. The "[p]roject[ion] for 2nd semester 1969-70" Composite Building information is as follows: Neshoba Central Elementary School, 43 White staff and teachers[11] and 17 Black staff and teachers; Neshoba Central Junior High, 12 White staff and teachers and 5 Black staff and teachers; and Neshoba Central High School, 26 White staff and teachers and 15 Black staff and teachers.

---

[10] On this 1969 form, the Court updates the "N" column as "Black" to reflect modern demographic terminology.

[11] "Total of White[ staff and teachers] includes [Native Americans]"

In the data provided in the Memorandum of Law in Support of Joint Motion for Declaration of Unitary Status, the 2023 through 2026 school year data for staff and faculty show improvement from the 1969 data. While the Court acknowledges that the percentage of Black staff and faculty now is less than the projected 2nd semester 1969-70 predictions, there are no all-Black schools in NCSD any longer; therefore, such variations amongst White and Black faculty and staff cannot be attributed to any particularized assignment by race. Further, the parties have attested that "[NCSD] has satisfied its obligation to desegregate its faculty and staff, and it is nondiscriminatory in its hiring and employment of faculty and staff." [Docket no. 5 at 7]. Where there is an absence of a complaint otherwise, a joint and voluntary resolution is preferable to continued litigation. *Jones*, 704 F.2d at 221. Accordingly, this Court finds that NCSD is likely unitary in regard to faculty assignment. A final decision on the unitary status in regard to faculty assignment will be made after the community hearing.

**C. Transportation**

"The scope of permissible transportation of students as an implement of a remedial decree has never been defined by" the United States Supreme Court. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 29 (1971). Accordingly, there are "[n]o rigid guidelines as to student transportation" to measure unitary status. *Id.*

In the 1969 Order, the Fifth Circuit directed that:

> The transportation system shall be completely re-examined regularly by the superintendent, his staff, and the school board. Bus routes and the assignment of students to buses will be designed to insure the transportation of all eligible pupils on a non-segregated and otherwise non-discriminatory basis.

Order at 11.

Here, NCSD and the United States have jointly agreed that: "[NCSD] has examined its transportation system, and it transports all eligible pupils on a nondiscriminatory basis." [Docket

no. 5 at 7]. Where there is an absence of a complaint otherwise, a joint and voluntary resolution is preferable to continued litigation. *Jones*, 704 F.2d at 221. Accordingly, this Court finds that NCSD is likely unitary in regard to transportation. A final decision on the unitary status in regard to transportation will be made after the community hearing.

**D. Facilities**

In the 1969 Order, the Fifth Circuit stated and directed that:

> The size and location of new school buildings and additions to existing buildings can significantly affect desegregation now and in the future.
>
> All school construction, school consolidation, and site selection (including the location of any temporary classrooms) in this system shall be done in a manner which will prevent the recurrence of the dual school structure once this desegregation plan is implemented.

Order at 14.

Regarding facilities, NCSD and the United States attest that: "[a]s with student assignments in [NCSD], [NCSD]'s single-grade structure inherently ensures that all students are provided the same facilities and resources without regard to race." [Docket no. 5 at 7]. Where there is an absence of a complaint otherwise, a joint and voluntary resolution is preferable to continued litigation. *Jones*, 704 F.2d at 221. Accordingly, this Court finds that NCSD is likely unitary in regard to facilities. A final decision on the unitary status in regard to facilities will be made after the community hearing.

**E. Extracurricular activities**

In the 1969 Order, the Fifth Circuit directed that:

> 5. Participation in extracurricular activities by students of both races should be actively encouraged by administrators and teachers as a means for developing school spirit and a feeling of belonging.
> 6. School organizations, student government, cheerleaders[,] musical organizations, athletic teams must be operated on a non[-]discriminatory basis and should include students of both races.

Order at 14.

NCSD and the United States attest that "[e]xtracurricular activities are open to all students regardless of race." [Docket no. 5 at 7]. Where there is an absence of a complaint otherwise, a joint and voluntary resolution is preferable to continued litigation. *Jones*, 704 F.2d at 221. Accordingly, this Court finds that NCSD is likely unitary in regard to extracurricular activities. A final decision on the unitary status in regard to extracurricular activities will be made after the community hearing.

## V. COMMUNITY HEARING

Desegregation cases transcend generations. Vestiges of past discrimination function as architecture for contemporary inequality. Past discrimination is often not captured through legal briefing in front of the Court, but rather through oral narratives, community story-telling, and local enterprise. Accordingly, this Court declines to make a definitive ruling on the unitary status of NCSD without first consulting the Neshoba County populus.

## VI. CONCLUSION

The Court's findings herein likely evince NCSD's good faith compliance with the obligation to eliminate the vestiges of discrimination within the school system; however, before a final decision is made, this Court gives the Neshoba County populus the opportunity to be heard.

**IT IS, THEREFORE, ORDERED** that a community hearing be held at Thad Cochran United States Courthouse (501 E. Court Street) in Jackson, Mississippi 39201, on October 21, 2026, at 1:00 p.m. in Courtroom 6A.

**IT IS FURTHER ORDERED** that counsel for Neshoba County School District will notify the community of the October 21st hearing as specified in the attached notice which includes details regarding the public comment procedure and modes of publication.

**SO ORDERED this the 21st day of September, 2026.**

**/s/HENRY T. WINGATE**
**UNITED STATES DISTRICT COURT JUDGE**